Funk *v.* Rent-All Mart, Inc. et al.

[Cite as *Funk v. Rent–All Mart, Inc.* (2001), 91 Ohio St.3d 78.]

(No. 00–1085—Submitted December 13, 2000—Decided February 28, 2001.)

Lundberg Stratton, J.  This matter comes to us as certified state law questions from the United States District Court for the Northern District of Ohio, Western Division, pursuant to S.Ct. Prac.R. XVIII.  In its certification order, the court stated:

"Plaintiff brings this cause of action asserting an intentional tort against his employer.  Plaintiff's cause of action arose on June 19, 1998 and was filed on February 8, 2000.  The Plaintiff asserts his cause of action is based on the common law pursuant to *Blankenship v. Cincinnati Milacron Chemicals, Inc.* [1982], 69 Ohio St.2d 608 [23 O.O.3d 504], 433 N.E.2d 572, *cert. denied,* 459 U.S.

857 [103 S.Ct. 127, 74 L.Ed.2d 110] (1982), and it[s] progeny, including *Fyffe·v. Jeno's Inc.,* 59 Ohio St.3d 115, 570 N.E.2d 1108 (1991). The Defendants have moved for dismissal of the action on the basis that it is untimely under Ohio Rev.Code § 2305.112, which requires that such an action be brought within one year. This statute, however, is based upon an enabling statute, Ohio Rev.Code § 2745.01, which was recently declared unconstitutional by the Ohio Supreme Court. See *Johnson v. BP Chemicals, Inc.,* 85 Ohio St.3d 298, 707 N.E.2d 1107 (1999). The issue is what impact the *Johnson* ruling has on the relevant statute of limitations, specifically whether the unconstitutionality of the enabling statute, Ohio Revised Code § 2745.01, renders the applicable statute of limitations, Ohio Rev.Code § 2305.112, ineffective. Thus, the questions to be presented are as follows:

"Is the statute of limitations under Ohio Rev.Code § 2305.112 viable in light of the ruling in *Johnson v. BP Chemicals, Inc.,* 85 Ohio St.3d 298, 707 N.E.2d 1107 (1999), which rendered the enabling statute, Ohio Rev.Code § 2745.01, unconstitutional? Does Ohio Rev.Code § 2305.112 apply to a common law cause of action brought by an employee against his employer pursuant to *Blankenship v. Cincinnati Milacron Chemicals, Inc.,* 69 Ohio St.2d 608 [23 O.O.3d 504], 433 N.E.2d 572, *cert. denied,* 459 U.S. 857 [103 S.Ct. 127, 74 L.Ed.2d 110] (1992) [*sic,* 1982]? If the statute of limitations is not one year pursuant to Ohio Rev.Code § 2305.112, what is the applicable statute of limitations for such causes of action?" (Footnote omitted.)

In response to the first question regarding the viability of the statute of limitations in R.C. 2305.112 following our opinion in *Johnson v. BP Chemicals, Inc.,* this court already addressed that question in *Mullins v. Rio Algom, Inc.* (1999), 85 Ohio St.3d 361, 708 N.E.2d 706. In *Mullins,* the United States District Court for the Southern District of Ohio, Western Division, certified the following question:

"Is Section 2745.01 of the Ohio Revised Code unconstitutional under state law thereby rendering Ohio Revised Code Section 2305.112 null and void?"

We concluded in *Mullins* that R.C. 2305.112 was null and void upon the authority of *Johnson v. BP Chemicals.* Therefore, our response to the first certified question in this case is in the negative. R.C. 2305.112 is no longer viable in light of *Johnson v. BP Chemicals.*

The second question certified to us is whether R.C. 2305.112 applies to a common-law cause of action brought pursuant to *Blankenship v. Cincinnati Milacron Chemicals,* 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572. Our response to the second question is also in the negative based on *Mullins v. Rio Algom.* Furthermore, notwithstanding *Mullins,* the plain language of the statute provides that it applies exclusively to actions for an employer intentional tort

under R.C. 2745.01. R.C. 2305.112(A). R.C. 2305.112 derived its existence from R.C. 2745.01. Because this court in *Johnson* determined R.C. 2745.01 to be unconstitutional in its entirety, it logically follows that R.C. 2305.112 no longer has any effect. There is no statutory basis for the application of the one-year limitations period in R.C. 2305.112. The statute is null and void.

Respondents urge us to consider the legislative history behind the enactment of R.C. 2745.01 and 2305.112, in which the General Assembly expressed its intent that R.C. 2745.01 and 2305.112 were to "completely and solely control" employer intentional tort causes of action. 146 Ohio Laws, Part I, 758. In addition, Section 4 of H.B. No. 103 stated:

"If any provision of a section of this act or the application thereof to any person or circumstances is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable." *Id.* at 759.

Respondents argue that the General Assembly intended for R.C. 2305.112 to be independent from R.C. 2745.01, and consequently, R.C. 2305.112 remains viable despite *Johnson* and potentially applicable to common-law actions for employer intentional tort. We do not agree. The language codified in R.C. 2305.112 confines its application solely to those actions authorized under R.C. 2745.01. The General Assembly could have written the statute to mandate a one-year statute of limitations for all employer intentional tort causes of action, including common-law actions arising under *Blankenship*. Instead, the General Assembly chose words that specifically limit the one-year statute of limitations to causes of action arising under R.C. 2745.01. Our duty as a court is to give effect to the words used in a statute, not to delete words used or to insert words not used. *State ex rel. Preston v. Peabody Coal Co.* (1984), 12 Ohio St.3d 72, 73, 12 OBR 63, 64, 465 N.E.2d 433, 435. Therefore, we have no choice but to rely on the words of the statute as it is written. R.C. 2305.112, as written, does not apply to a common-law action brought by an employee against an employer pursuant to *Blankenship.*

The third question posed to this court asks, "If the statute of limitations is not one year pursuant to Ohio Rev.Code § 2305.112, what is the applicable statute of limitations for such causes of action?" In *Hunter v. Shenango Furnace Co.* (1988), 38 Ohio St.3d 235, 527 N.E.2d 871, the issue before the court was the appropriate statute of limitations for a cause of action for an employer intentional tort that arose prior to the effective date of former R.C. 4121.80, the General Assembly's initial attempt to codify actions against employers for intentional torts. In *Hunter,* we held that "[u]nless the circumstances of an action clearly indicate a battery or any other enumerated intentional tort in the Revised Code,

a cause of action alleging bodily injury as a result of an intentional tort by an employer * * * will be governed by the two-year statute of limitations established in R.C. 2305.10." *Id.* at syllabus. See, also, *Gambill v. Bonded Oil Co.* (1990), 52 Ohio St.3d 90, 556 N.E.2d 177.

We believe that the analysis in *Hunter* is equally applicable today. Although a complaint may label its cause of action an "intentional tort," we look to the actual nature or subject matter pleaded in the complaint. If the essence of a plaintiff's complaint alleges bodily injury as the result of an employer intentional tort, the two-year statute of limitations in R.C. 2305.10 should apply. *Hunter*, 38 Ohio St.3d at 237–238, 527 N.E.2d at 873–874.

Therefore, we hold that unless the circumstances of an action clearly indicate a battery or any other enumerated intentional tort.in the Revised Code, a cause of action alleging bodily injury as a result of an intentional tort by an employer pursuant to *Blankenship v. Cincinnati Milacron Chemicals*, 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572, will be governed by the two-year statute of limitations established in R.C. 2305.10.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., concurs in judgment.

---

*John K. Fitch*, for petitioner.

*Earl Warburton Adams & Davis* and *Thomas L. Davis; Spengler Nathanson P.P.L.* and *James R. Jeffery*, for respondents.

---

PERSONS, APPELLEE, *v.* COCHRAN, APPELLEE; OHIO
ADULT PAROLE AUTHORITY, APPELLANT.

[Cite as *Persons v. Cochran* (2001), 91 Ohio St.3d 81.]

(No. 00–1619—Submitted January 31, 2001—Decided February 28, 2001.)

---

*Per Curiam.* The judgment of the court of appeals is reversed on the authority of *Woods v. Telb* (2000), 89 Ohio St.3d 504, 733 N.E.2d 1103, and the

cause is remanded for judgment consistent with *Woods.* See, also, *State ex rel. Mosley v. Nichols* (2001), 90 Ohio St.3d 517, 739 N.E.2d 800; *Price v. Henry* (2000), 89 Ohio St.3d 521, 733 N.E.2d 1116; *State v. Jones* (2000), 89 Ohio St.3d 519, 733 N.E.2d 1115.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Betty D. Montgomery,* Attorney General, and *Stephanie L. Watson,* Assistant Attorney General, for appellant.

---

THE STATE EX REL. SWINGLE, APPELLANT, *v.* ZALESKI, CLERK, APPELLEE.

[Cite as *State ex rel. Swingle v. Zaleski* (2001), 91 Ohio St.3d 82.]

(No. 00–1781—Submitted January 31, 2001—Decided February 28, 2001.)

---

*Per Curiam.* In 1995, appellant, Daniel Swingle, pleaded guilty to and was convicted of felonious sexual penetration and gross sexual imposition and was sentenced in 1996 to an aggregate prison term of six to twenty-five years.

In July 2000, Swingle filed a complaint in the Court of Appeals for Summit County. Swingle requested a writ of mandamus to compel appellee, Summit County Clerk of Courts Diana Zaleski, to file certain pleadings, which he claimed she had refused to file. Swingle also sought a writ of habeas corpus to compel his immediate release from prison. Zaleski filed a motion to dismiss Swingle's complaint because Swingle failed to comply with the R.C. 2969.25(A) filing requirements for inmates concerning civil actions or appeals against government entities or employees. Zaleski further contended that some of Swingle's plead-

ings had in fact been filed and that he had failed to comply with the habeas corpus requirements of R.C. 2725.04.

In September 2000, the court of appeals dismissed the complaint because Swingle failed to comply with R.C. 2969.25(A).

In this cause now before the court upon an appeal as of right, Swingle asserts that the court of appeals erred in dismissing his complaint for writs of mandamus and habeas corpus. For the following reasons, Swingle's assertions are meritless.

Contrary to Swingle's contentions, the filing requirements of Sub.H.B. No. 455, which includes R.C. 2969.25(A), are not *ex post facto* legislation. These requirements became effective in 1996 and apply *prospectively* to actions commenced thereafter. See 146 Ohio Laws, Part III, 5128, 5133. They neither impair vested rights, affect accrued substantive rights, nor impose new or additional burdens, duties, obligations, or liabilities for past transactions. See, *e.g.*, *State v. Hawkins* (1999), 87 Ohio St.3d 311, 313–314, 720 N.E.2d 521, 523–524. In addition, Swingle does not contend that R.C. 2969.25(A) is inapplicable to mandamus and habeas corpus actions. See *State ex rel. Jefferson v. Ohio Adult Parole Auth.* (1999), 86 Ohio St.3d 304, 305, 714 N.E.2d 926, 927.

Further, a writ of mandamus will not issue to compel an act that has already been performed. *State ex rel. Taylor v. Leffler* (2000), 88 Ohio St.3d 178, 179, 724 N.E.2d 422, 423. Many of the pleadings mentioned by Swingle have already been filed by Zaleski.

Finally, Swingle did not comply with the R.C. 2725.04 requirements for his habeas corpus claim, including that he attach a copy of his commitment papers. See *Hairston v. Seidner* (2000), 88 Ohio St.3d 57, 58, 723 N.E.2d 575, 576.

Based on the foregoing, we affirm the judgment of the court of appeals.[1]

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Daniel Swingle, pro se.*

---

1. We also deny Swingle's motion to supplement the record.

Reyes, Appellant, *v.* Tate, Warden, Appellee.

[Cite as *Reyes v. Tate* (2001), 91 Ohio St.3d 84.]

(No. 00–1876—Submitted January 31, 2001—Decided February 28, 2001.)

*Per Curiam.* In March 1993, the Cuyahoga County Court of Common Pleas convicted appellant, Armando Reyes, of attempted robbery and sentenced him to prison. Reyes's sentence was suspended, and he was placed on two years' probation. Thereafter, Reyes violated the terms of his probation and was incarcerated. Reyes was subsequently paroled, and his parole officer ordered him not to visit the residence of his ex-girlfriend without the officer's written permission.

On July 26, 1997, the record indicates that Reyes went to his ex-girlfriend's home, damaged her screen-door window by throwing a hammer through it, and then beat up her new boyfriend by hitting him repeatedly with a piece of wood. Although the state entered a *nolle prosequi* on new charges of felonious assault and aggravated burglary arising from Reyes's conduct, the Ohio Parole Board revoked his parole based on this conduct in July 1997. In October 1999, the board relied on Reyes's July 1997 conduct in deciding not to parole him and to have him continue his incarceration until the expiration of his maximum sentence.

In March 2000, Reyes filed a petition in the Court of Appeals for Belmont County for a writ of habeas corpus to compel appellee, Reyes's prison warden, to release him from prison. Reyes claimed that the state's dismissal of the 1997 criminal charges removed all factual support for them and that the Parole Board's continued reliance on this alleged conduct violated his constitutional due process rights. Appellee filed a motion to dismiss. In September 2000, the court of appeals granted appellee's motion and dismissed the petition.

In his appeal as of right, Reyes essentially asserts that the court of appeals erred in dismissing his habeas corpus petition. Reyes's assertion lacks merit.

"Parole may be revoked even though criminal charges based on the same facts are dismissed, the defendant is acquitted, or the conviction is overturned, unless all factual support for the revocation is removed." *Moore v. Leonard* (1999), 85 Ohio St.3d 189, 190, 707 N.E.2d 867, 868. The state's dismissal of the felonious assault and aggravated burglary charges against Reyes did not remove all factual support for the revocation. The attachments to Reyes's petition establish that

the Parole Board had substantial evidence before it, including the testimony of police officers, to support its findings that Reyes committed the charged parole violations, *i.e.*, that he criminally damaged property, assaulted his ex-girlfriend's new boyfriend, and failed to obey an order of his parole officer. See *State ex rel. Parker v. Tate* (1999), 86 Ohio St.3d 625, 626, 716 N.E.2d 210, 211.

In addition, as long as an unreasonable delay has not occurred, the remedy for noncompliance with parole-revocation due process requirements is generally a new hearing, not outright release from prison. *State ex rel. Johnson v. Ohio Adult Parole Auth.* (2000), 90 Ohio St.3d 208, 209, 736 N.E.2d 469, 471.

Finally, Reyes has no constitutional or inherent right to be conditionally released from prison before the expiration of his sentence. *State ex rel. Recker v. Leonard* (2000), 88 Ohio St.3d 223, 224, 724 N.E.2d 805, 806.

Therefore, the court of appeals properly dismissed the petition. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

Moyer, C.J., Douglas, Resnick, F.E. Sweeney, Pfeifer, Cook and Lundberg Stratton, JJ., concur.

---

*Armando Reyes*, pro se.

*Betty D. Montgomery*, Attorney General, and *Diane Mallory*, Assistant Attorney General, for appellee.

OFFICE OF DISCIPLINARY COUNSEL *v.* KLAAS.

[Cite as *Disciplinary Counsel v. Klaas* (2001), 91 Ohio St.3d 86.]

(No. 00–1109—Submitted October 11, 2000—Decided February 21, 2001.)

*Per Curiam.* On December 7, 1998, relator, Office of Disciplinary Counsel, filed a complaint with the Board of Commissioners on Grievances and Discipline of the Supreme Court against respondent, Monica Ann Hansen Klaas of Wooster, Ohio, Attorney Registration No. 0065095, alleging that she had violated the following Disciplinary Rules of the Code of Professional Responsibility: DR 1–102(A)(3) (engaging in illegal conduct involving moral turpitude), 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), and 1–102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law). Respondent answered, and the matter was heard by a panel of the board on March 31, 2000.

The panel found that on August 20, 1997, respondent acquired information that the FBI and local law enforcement agencies would soon be conducting a drug raid in Wooster, Ohio. Upon receiving this information, respondent notified a former client about the upcoming drug raid. Because she suspected her former client to be a drug dealer, she advised him to "clean up his act" or to be "squeaky clean," which suggested to him that he dispose of any drugs in his possession before the drug raid. The raid occurred on August 21, 1997, and respondent's former client was arrested the following day. At that time the former client agreed to cooperate with law enforcement authorities and testify against respondent. As a result, respondent was convicted of attempted obstruction of justice, sentenced to six months in jail, and fined $1,000.

The panel concluded that respondent's actions violated DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6), but found that there was insufficient evidence to

conclude that respondent violated DR 1–102(A)(3). In mitigation, the panel found that respondent cooperated with relator in its investigation. It also noted that she served time in jail for her conduct and while incarcerated performed community service for a legal aid society. The panel further found that respondent's actions did not involve any malicious intent but that she had simply exercised poor judgment. Observing that respondent was extremely remorseful, the panel recommended that she be suspended from the practice of law for one year with six months stayed, during which time she would be on probation. The panel also recommended that relator select a monitor to assist respondent in exercising proper judgment and maintaining professional distance from her clients. The board adopted the findings, conclusions, and recommendations of the panel.

We adopt the findings and recommendations of the board. However, in addition to the board's conclusion that respondent violated DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6), we conclude that respondent's conduct involved moral turpitude and violated DR 1–102(A)(3).

In reaching this latter conclusion, we reject relator's position that a conviction for obstruction of justice or attempted obstruction of justice is a *per se* violation of DR 1–102(A)(3). We have previously stated that "proof of a criminal conviction is generally not conclusive of the issue of moral turpitude * * *. Rather, where moral turpitude is disputed, an independent review of the circumstances underlying criminal convictions is necessary to determine if they manifest the requisite lack of social conscience and depravity beyond any established criminal intent." *Disciplinary Counsel v. Burkhart* (1996), 75 Ohio St.3d 188, 191, 661 N.E.2d 1062, 1065. In other words, a conclusion that an attorney has violated DR 1–102(A)(3) is to be made on a case-by-case basis.

We have held that acts of moral turpitude "must be measured against the accepted standards of morality, honesty, and justice prevailing upon the community's collective conscience." *Id.* Additionally, in determining whether the acts of an attorney constitute moral turpitude, we place special emphasis on the status of an attorney in relation to the public at large. Attorneys assume a "position of public trust" and are in a "position of responsibility to the law itself, and any disregard thereof by him is much more heinous than that by the layman." *Cincinnati Bar Assn. v. Shott* (1967), 10 Ohio St.2d 117, 131, 39 O.O.2d 110, 119, 226 N.E.2d 724, 733.

The circumstances in this case indicate that by her conduct respondent disregarded the standards of morality, honesty, and justice to which an attorney must adhere. Here, respondent attempted to undermine the effectiveness of a drug raid conducted by federal and local law enforcement officers by secretly informing a former client about the imminent raid. Respondent thereby disre-

garded her duty to faithfully uphold the law and attempted to use her status as an attorney to obstruct justice. This conduct did involve moral turpitude.

Respondent is hereby suspended from the practice of law in Ohio for one year with six months of the suspension stayed. Additionally, the stayed part of her suspension shall be a period of probation during which respondent shall work with a monitor chosen by relator to assist her in maintaining professional relationships with her clients. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

---

COOK, J., concurring in judgment. I agree with the sanction imposed by the majority and therefore concur in judgment. I disagree, however, with the majority's conclusion that the respondent violated DR 1–102(A)(3) by engaging in illegal conduct involving "moral turpitude." I would adopt the board's finding that there was insufficient evidence of a DR 1–102(A)(3) violation.

Acts of "moral turpitude" are not precisely defined. See *Disciplinary Counsel v. Burkhart* (1996), 75 Ohio St.3d 188, 190, 661 N.E.2d 1062, 1064–1065. But we usually characterize them as involving "baseness, vileness, or the depravity in private and social duties which [a] man owes to his fellow man, or to society in general." *Id.* (internal quotations omitted), quoting *State v. Adkins* (1973), 40 Ohio App.2d 473, 475, 69 O.O.2d 416, 417, 320 N.E.2d 308, 310. The respondent's actions leading to her conviction for attempted obstruction of justice arguably fit this definition. As the majority acknowledges, however, we undertake an independent review of the circumstances underlying a criminal conviction "to determine if they manifest the requisite lack of social conscience and depravity beyond any established criminal intent." *Burkhart*, 75 Ohio St.3d at 191, 661 N.E.2d at 1065.

The majority finds moral turpitude based on its finding that the respondent "attempted to undermine the effectiveness of a drug raid conducted by federal and local law enforcement officers by secretly informing a former client about the imminent raid." The panel, however, made no such finding and instead recognized that the respondent "had no malicious intent and simply exercised very poor judgement * * *." The board concurred with the panel, apparently believing that what motivated the respondent was a desire to keep her client out of jail rather than an intent to undermine the entire large-scale drug raid. This

interpretation of the respondent's conduct is certainly plausible: she tipped only one person out of approximately seventy who were arrested in the raid by federal and local law enforcement agencies.

I agree that the sanction imposed today is warranted for violations of DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6). But I would not depart from the board's conclusion that this misconduct did not present a violation of DR 1–102(A)(3).

---

*Jonathan E. Coughlan*, Disciplinary Counsel, and *Kevin L. Williams*, Assistant Disciplinary Counsel, for relator.

*Geoffrey Stern*, for respondent.

THE STATE EX REL. RITER, F.K.A. MAYLE, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Riter v. Indus. Comm.* (2001), 91 Ohio St.3d 89.]

(No. 99–841—Submitted November 28, 2000—Decided March 7, 2001.)

---

*Per Curiam.* In 1991, appellant-claimant, Velma J. Riter, f.k.a. Mayle, broke her thumb while working for appellee Timken Company. Five surgeries later, it became clear that claimant's interphalangeal ("IP") joint was ankylosed and could not bend. Appellee Industrial Commission of Ohio found an eleven percent permanent partial disability as a result.

In 1993, claimant sought a scheduled award for loss of use of her thumb under R.C. 4123.57(B). A district hearing officer's award for only one-half, not total, loss prompted appeals that eventually led to a hearing before a commission deputy. He prepared an order awarding claimant compensation for full loss of

use. However, when the order was presented to the commission for approval, two of the three commissioners refused to approve it.

Somehow, on March 3, 1997, the unapproved order was mailed to the parties. When the commission learned of this, it vacated the order and set the matter for commission hearing. The commission, splitting two to one, eventually awarded claimant compensation for one-half loss of use only.

The Court of Appeals for Franklin County, on claimant's petition for a writ of mandamus, upheld the commission's order, and denied the writ. This cause is now before this court upon an appeal as of right.

Claimant challenges the commission's jurisdiction to vacate the March 3, 1997 order and the merits of the order that followed. Finding these challenges to be unpersuasive, we affirm the judgment of the court of appeals.

Claimant initially argues that the commission lacked jurisdiction to vacate the March 3, 1997 order awarding her compensation for total loss of use. This contention lacks merit.

Former R.C. 4121.03(A) (now 4121.03[E]) requires that a deputy-issued order must be approved by a commission majority. The March 3, 1997 order was not so approved, and its issuance was, therefore, a mistake of law sufficient to invoke the commission's continuing jurisdiction under R.C. 4123.52. *State ex rel. B & C Machine Co. v. Indus. Comm.* (1992), 65 Ohio St.3d 538, 605 N.E.2d 372.

Contrary to claimant's assertion, the commission's actions did not contravene any time constraints governing reconsideration. The commission acted *sua sponte* and not in response to any formal request by Timken for reconsideration.

Claimant also argues that under *State ex rel. Nicholls v. Indus. Comm.* (1998), 81 Ohio St.3d 454, 692 N.E.2d 188, the commission's explanation that the order "was issued in error" was not sufficient to justify continuing jurisdiction absent identification of the perceived error. This is incorrect. In this case, the error was apparent from the order's face—it was unnecessary to additionally articulate it in the vacation order that followed.

Accordingly, the commission did not abuse its discretion in exercising its continuing jurisdiction.

We turn next to the issue of compensation pursuant to R.C. 4123.57(B). A permanent and total loss of use of an enumerated body part warrants a scheduled loss award under R.C. 4123.57(B). Compensation for loss of thumb, for example, warrants sixty weeks of compensation. Loss of a finger ranges from thirty-five weeks for the index to fifteen weeks for the little finger.

The statute also specifies, to some degree, how loss is measured, based on the anatomy of the affected member. For example, proceeding from the base of the finger outward, there is a metacarpophalangeal joint followed by a proximal

phalanx. It continues with the proximal interphalangeal ("PIP") joint, the middle phalanx, the distal interphalangeal ("DIP") joint, and finally the third, or distal, phalanx ("DP"). Stedman's Medical Dictionary (26 Ed. 1995) 1030; University of Washington Radiology Webserver (*http://www.rad.washington.edu/RadAnat/HandPALabelled.html*).

Consistent with this structure, R.C. 4123.57(B) provides:

"The loss of the third, or distal, phalange of any finger is considered equal to the loss of one-third of the finger.

"The loss of the middle, or second, phalange of any finger is considered equal to the loss of two-thirds of the finger.

"The loss of more than the middle and distal phalanges of any finger is considered equal to the loss of the whole finger."

The thumb has one fewer joint and bone. There is no middle phalanx, and the joint connecting the proximal and distal phalanges is simply called the interphalangeal ("IP") joint. *Id.* As to the thumb, the statute directs:

"The loss of a second, or distal phalange of the thumb is considered equal to the loss of one half of such thumb; the loss of more than one half of such thumb is considered equal to the loss of the whole thumb."

There is no dispute that claimant's IP joint has no range of motion due to ankylosis. We must determine whether this entitles claimant to compensation for the loss of the whole thumb. We find that it does not.

First, claimant argues that since (1) loss of the distal phalanx is statutorily equated to one-half loss of the thumb and (2) *more* than one-half loss is construed as a full loss, the loss of the IP joint is an addition that pushes claimant over the threshold. She couples this assertion with a reminder that under R.C. 4123.95, the workers' compensation statutes are to be liberally construed in a claimant's favor.

Second, claimant points to Commission Memo F.4, which awards compensation for a full finger loss when the PIP joint, or mid knuckle, is ankylosed, and asserts that consistency demands the same award when the thumb's mid knuckle, or IP joint, is fused. Memorandum No. F.4 (Jan. 1, 1989), in Industrial Commission Hearing Officer Manual, reprinted in Fulton, Anderson's 2000 Ohio Workers' Compensation Handbook (6 Ed. 2000) 435. Claimant observes that, with language similar to that concerning the thumb, R.C. 4123.57 directs that loss of more than the distal and middle phalanges of the finger is considered a total finger loss. Thus, if ankylosis of the PIP joint is considered a loss of more than the distal and middle phlanges, and thus a full loss—as Memo F.4 says it is—then ankylosis of the IP joint must be considered the same for the thumb.

Appellees counter that had the General Assembly intended such an effect, it could have so provided. While true, this ignores the use in R.C. 4123.57(B) of the same "more than" language for thumbs and fingers, and, in the latter instance, the commission has interpreted that language as encompassing the PIP joint.

Appellees' stronger argument lies in the significantly distinct functions of the thumb and fingers. Viewing the hand as a whole, there are two categories of movement of which it is capable: prehensile and nonprehensile. John Napier, Hands (1993 Rev. Ed.). Prehensile movements "are those in which an object, fixed or free, is held by a gripping or pinching action between the digits and the palm." *Id.* at 74. Nonprehensile movements, on the other hand, include "pushing, lifting, tapping and punching movements of the fingers, such as typewriting or working the stops of a musical instrument." *Id.*

The thumb is the key to grasping and gripping. *Id.* at 91. John Napier, one of the world's leading primatologists of the last century, has written:

"A hand without a thumb is at worst nothing but an animated fish-slice, and at best a pair of forceps whose points do not meet properly. Without the thumb, the hand is put back sixty million years in evolution terms to a stage when the thumb had no independent movement and was just another digit. One cannot emphasize enough the importance of finger-thumb opposition for human emergence from a relatively undistinguished primate background." *Id.* at 128–129.

Mechanically, the thumb "is the only digit in the hand that has this freedom to rotate or swivel; it is also unique in that all of its movements can take place independent of those of any of the other fingers; as everyone says, the combination of strength, independence and versatility sets it apart. Because of its unique capabilities * * * the thumb, if need be, can carry on a solo act." Frank R. Wilson, The Hand, at 138–139.

The thumb's special properties derive from two sources: (1) the metacarpal bone, which proceeds from the metacarpophalangeal joint at the thumb's base, down towards the wrist, and (2) the metacarpocarpal joint at the base of the hand near the wrist. As Napier observes:

"The thumb metacarpal is unique. Alone amongst the metacarpals, it articulates by means of a freely movable saddle joint with the carpals. The remaining carpals are of the plane joint variety which have very small ranges of movement. The metacarpocarpal joint of the thumb, being of the saddle type, is almost as mobile as a ball and socket joint and has the following movements: adduction-abduction, flexion-extension and medial lateral rotation." *Id.* at 66.

Continuing, he reported:

"The functional advantage of a saddle joint is that the two opposing surfaces and their supporting ligaments are so arranged that the stability of the joint is

provided without the need for a cuff of bulky muscles disposed around the joint to control and direct its movement, as is the case for other ball-and-socket joints like the shoulder and the hip. Bulky muscles at the root of the thumb would seriously impair its manipulative skill and flexibility." *Id.*

These passages demonstrate that the thumb is truly unique and that evaluating it under standards directed at the fingers just doesn't work. The key to the thumb's uniqueness and utility lies in the metacarpal bone and metacarpocarpal joint. Thus, to say that ankylosis of the IP joint makes the thumb totally useless is wrong.

Claimant last argues that to deny compensation for total loss of use for the thumb's IP joint while awarding it for the PIP joint in the fingers violates equal protection. This fails. The two classes of injured individuals are not similarly situated, which is an equal protection prerequisite. *State ex rel. Nyitray v. Indus. Comm.* (1983), 2 Ohio St.3d 173, 2 OBR 715, 443 N.E.2d 962. Their injuries are different and have different effects on digit use and disability. Claimant has presented no evidence that others with ankylosed IP joints are receiving compensation for full loss of use. Accordingly, her argument is rejected.

The judgment of the court of appeals is affirmed for the reasons set forth above.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Zwick Law Offices Co., L.P.A.,* and *James P. Proctor,* for appellant.

*Betty D. Montgomery,* Attorney General, and *C. Bradley Howenstein,* Assistant Attorney General, for appellee Industrial Commission.

*Day, Ketterer, Raley, Wright & Rybold, Ltd., Darrell N. Markijohn* and *Aaron E. McQueen,* for appellee Timken Company.

PATON, N.K.A. SAXTON, APPELLEE, *v.* PATON ET AL.; ALLEN COUNTY
CHILD SUPPORT ENFORCEMENT AGENCY, APPELLANT.

[Cite as *Paton v. Paton* (2001), 91 Ohio St.3d 94.]

(No. 99–848—Submitted December 12, 2000—Decided March 7, 2001.)

ALICE ROBIE RESNICK, J.   On June 9, 1998, appellant, the Allen County Child Support Enforcement Agency, filed a "Motion for Review of Child Support, Determination of Arrearages, Lump Sum Judgment, Wage Withholding," in a case involving Ann Paton (n.k.a. Ann Saxton) and her former husband, Michael Paton.

The Patons' marriage was dissolved in 1983, and pursuant to the separation agreement Michael Paton was obligated to pay child support and to maintain major medical and hospitalization insurance for the benefit of his children. Saxton is the residential parent of their youngest daughter, Michelle, who was born in 1982 and has a learning disability.

On August 12, 1998, at a hearing before a magistrate on appellant's motion, Paton and Saxton testified regarding their respective incomes and expenses.   At the time of the hearing, Michelle was enrolled in a public high school and received supplemental security income ("SSI") benefits in the amount of $387 a month ($4,644 a year).   On August 13, 1998, the magistrate filed a decision in which Paton's child support obligation was reduced.

Saxton filed objections to the magistrate's decision because the magistrate treated Michelle's SSI benefits as a financial resource of the child pursuant to R.C. 3113.215(B)(3)(f), and deducted an amount representing Michelle's annual

SSI benefits from her parents' combined annual support obligation.[1] The trial court overruled Saxton's objections and adopted the magistrate's decision and recommendation. A final order modifying child support was filed on October 5, 1998.

On appeal from the trial court's judgment, Saxton argued that the trial court erred when it included Michelle's SSI benefits in the basic child support worksheet. Saxton maintained that these benefits are intended to supplement Michelle's income and should not be used to reduce her parents' support obligation.

On March 16, 1999, the court of appeals reversed the trial court's judgment and remanded the matter for further proceedings. The court of appeals concluded that the SSI benefits Michelle receives as a consequence of her disability "should not be considered when determining the support obligation of her parents. To do so defeats the purpose behind supplemental security income benefits, and it also interferes with the eligibility guidelines of the social security laws." The court of appeals found "as a matter of law that supplemental security income benefits should not be used to decrease the parent's support obligation." The court also noted that the trial court did not comply with R.C. 3113.215(B)(1)(b) and (B)(2)(c) because it failed to journalize findings of fact supporting its deviation from the basic child support schedule.

On April 30, 1999, the Allen County Child Support Enforcement Agency filed its notice of appeal in this court. We allowed the appeal and *sua sponte* ordered that this cause be held for our decision in *Williams v. Williams* (2000), 88 Ohio St.3d 441, 727 N.E.2d 895.[2] See *Paton v. Paton* (1999), 86 Ohio St.3d 1465, 715 N.E.2d 568. We subsequently *sua sponte* lifted the stay and ordered the parties to brief the merits. See (2000), 89 Ohio St.3d 1436, 730 N.E.2d 990.

The issue presented for our determination is whether supplemental security income benefits received by a disabled child constitute a financial resource of the

---

1. In 1998, Michelle received $387 a month ($4,644 a year) in SSI benefits. The combined annual child support obligation of her parents was $6,676. The trial court subtracted Michelle's SSI benefits from her parents' combined annual child support obligation. The remaining $2,032 was to be paid by Saxton and Paton according to their proportional share of the total family income. Paton earned seventy percent of the total family income. Thus, Paton's annual child support obligation was determined to be $1,422. From this, the court subtracted $642 paid by Paton for expenses, leaving $798. This results in a monthly child support obligation of $66.50.

2. In *Williams*, we announced that "[a] disabled parent is entitled to a full credit in his or her child support obligation for Social Security payments received by a minor child due to the parent's disability." *Id.*, 88 Ohio St.3d 441, 727 N.E.2d 895, syllabus.

   *Williams* is distinguishable from the case at bar because in *Williams* it was the obligor, rather than the child, who was disabled. Moreover, the categories of benefits at issue in each of these cases are different. Thus, in *Williams*, we found that "Social Security payments are tantamount to earnings by the disabled parent." *Id.* at 444, 727 N.E.2d at 898.

child pursuant to R.C. 3113.215(B)(3)(f) in order to justify a trial court's deviation from the basic child support schedule.

In any action in which a child support order is issued or modified, a trial court is required to determine the amount of the obligor's child support obligation consistent with the basic child support schedule and guidelines set forth in R.C. 3113.215(D), (E), and (F). R.C. 3113.215(B)(1). The figure calculated in accordance with these guidelines represents the amount of child support due and is rebuttably presumed to be correct. *Id.* A trial court may not deviate from the amount calculated using the guidelines, unless the court considers the factors set forth in R.C. 3113.215(B)(3)(a) through (p), and determines that such an amount "would be unjust or inappropriate and would not be in the best interest of the child." R.C. 3113.215(B)(2)(c)(i). Additionally, the court must journalize the "amount of child support calculated pursuant to the basic child support schedule and pursuant to the applicable worksheet * * * its determination that that amount would be unjust or inappropriate and would not be in the best interest of the child, and findings of fact supporting that determination." R.C. 3113.215(B)(2)(c)(ii); see, also, *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 601 N.E.2d 496, paragraph three of the syllabus.

In order to justify its deviation from the basic child support schedule, the trial court, in the case at bar, relied on R.C. 3113.215(B)(3)(f), which allows a court to consider the "financial resources and the earning ability of the child." The financial resource attributed to Michelle was the $4,644 that she received in annual SSI benefits.

While we do not dispute that SSI benefits are arguably a financial resource of a recipient, we do not believe that SSI benefits are the type of "financial resource" that justifies a trial court's decision to deviate from the basic child support schedules.

"The basic purpose underlying the supplemental security income program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." Section 416.110, Title 20, C.F.R.

The supplemental security income program provides means-tested public assistance to those who qualify. See, generally, Section 1382a, Title 42, U.S.Code. The amount of SSI an eligible individual receives is determined based upon the individual's income and resources. *Id.* If the recipient of SSI is a child who receives child support, the amount of child support received from the absent parent must be taken into account when determining the amount of SSI the child will receive. Section 1382a(b)(9), Title 42, U.S.Code. A recipient's eligibility for continued participation in the program as well as the amount of benefits the

participant receives is reviewed periodically. Section 1382(c)(1), Title 42, U.S.Code.

A majority of jurisdictions that have addressed this issue hold that "a parent is not entitled to a credit in his [or her] child support obligation for SSI benefits received on behalf of a disabled child." *State ex rel. Dept. of Social Serv. Div. of Child Support Enforcement v. Kost* (Mo.App.1998), 964 S.W.2d 528, 530, citing *Hollister v. Whalen* (1997), 244 A.D.2d 650, 663 N.Y.S.2d 918; *Bennett v. Virginia* (1996), 22 Va.App. 684, 694–695, 472 S.E.2d 668, 673; *Kyle v. Kyle* (Ind.App.1991), 582 N.E.2d 842, 846; *In re Marriage of Thornton* (Colo.App. 1990), 802 P.2d 1194, 1196; and *Oatley v. Oatley* (1977), 57 Ohio App.2d 226, 11 O.O.3d 260, 387 N.E.2d 245.

According to one court, "Congress included disabled children under the SSI program in the 'belief that disabled children who live in low-income households are certainly among the most disadvantaged of all Americans and that they are deserving of special assistance in order to help them become self-supporting members of our society.' " *Kyle v. Kyle*, 582 N.E.2d at 846 (quoting H.R.Rep. No. 231, 92nd Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Admin. News 4989, 5133–5134).

The factual scenario before us is quite different from one involving a child who has independent financial assets such as an inheritance or income derived from employment. While these assets may lessen a child's need for financial support from his or her parents, SSI benefits, which are unlike other types of financial resources, do not diminish a child's need for support. See *Kost*, 964 S.W.2d at 530. SSI benefits received by a disabled child "are intended to supplement other income, not substitute for it." *Oatley v. Oatley*, 57 Ohio App.2d at 228, 11 O.O.3d at 262, 387 N.E.2d at 246.[3]

The court of appeals correctly observed that reducing a parent's child support obligation by an amount representing the child's SSI benefits "would frustrate the purpose of the federal law by pushing the child's standard of living back below the federal minimum." Such an approach would result in a "stair-step" effect that would increase the child's reliance on federal assistance while decreasing the parents' financial responsibility, because as the child's SSI benefits increase, the parents' support obligation simultaneously decreases. In order to avoid this unintended and absurd result, "[t]he amount of supplemental security income received is modified as the amount of the recipient's other income changes, not vice versa." *Oatley*, 57 Ohio App.2d at 228, 11 O.O.3d at 262, 387 N.E.2d at 246.

---

---

*Gooding, Huffman, Kelley & Becker* and *John C. Huffman,* for appellee.

*David R. Evans,* for appellant.